THOMAS SHERLOCK ET AL. *v.* THE GLOBE INSURANCE COMPANY OF CINCINNATI.

Where a vessel is insured, negligence on the part of the officers in charge will not relieve the insurer from liability, unless their conduct has been fraudulent or barratrous.

It is well settled that in all cases of loss, in determining the liability of the underwriter, the proximate and not the remote cause is to be considered.

When a vessel is so injured as to cease to be of any value as a vessel, a total loss occurs, which fixes the liability of the insurer, even though there be no technical abandonment.

In the United States a constructive total loss occurs when the cost of repair would exceed half the value of the vessel.

The necessity of an abandonment may be constructively waived by the insurer.

A claim of total loss made to the insurer, and an unconditional refusal by the insurer to pay the loss, is equivalent to an abandonment.

Where the salvage of the wreck is not used for repairs, but in the construction of a new vessel, no claim by the insurer of one-third new for old will be allowed.

The non-compliance by the owners of a vessel with a statute prohibiting, under a pecuniary penalty, the carrying certain material without special license, can not affect the insurance on vessel or cargo.

The suit was brought upon a policy issued by the defendants on the 1st of May, 1868, insuring the plaintiffs as owners of the steamboat United States, against loss by fire, for the term of one year, the vessel having liberty to navigate the usual Western rivers.

She was insured in $10,000, and the premium paid for the risk was $500. It is alleged that while the boat was navigating the Ohio river between Cincinnati and Louisville, she was damaged by fire to the amount of $126,442.50, the boat being valued at $140,000, with the privilege of being insured in the sum of $105,000.

The plaintiffs claim that in consequence of such loss the defendants are bound to pay to them $9,031.60, for which sum they claim judgment.

The defendants answer: 1st. Denying their liability generally. 2d. That the officer of the boat did not pursue the regulations adopted by the supervising inspectors under the acts of Congress; whereby, in disobeying the same, and not pursuing, in the navigation of the river, the mode required by such regulations, the damage sustained by the vessel insured occurred; and, therefore, by the willful act of the officers in this behalf, the insurers are discharged from any liability on their policy. 3d. That in consequence of the neglect of those navigating the boat, a collision occurred between her and the steamboat America, the one ascending and the other descending the river, by means whereof the America struck with great force and violence the United States, then laden with coal-oil, whisky, and other combustible materials, whereby the same became ignited by friction or by communication with the fires ordinarily burning upon the steamboat, and that all loss and damage to the United States were produced by the carelessness and negligence of the plaintiffs, their agents, and servants.

A fourth cause of defense is averred that the premium was not paid within the period required by the terms of the contract, and therefore the policy was void, but this cause was afterward withdrawn.

To this answer the plaintiffs replied generally, denying all the allegations of the defendants.

An additional answer was afterward filed by leave, which denied that the boat at the time of the loss was "riverworthy," as required by the policy; but, on the contrary, before and at the time of the alleged loss, oil of vitriol had been and was then carried on the boat as freight, contrary to the act of Congress in such case made and provided.

In reply to this additional answer, the plaintiffs denied that the allegations made therein were true.

The case at Special Term was tried by a jury. The evidence in the case was exceedingly voluminous, but in substance it appeared that on the night of the 4th of Decem-

ber, 1868, the steamboat America was ascending the Ohio river on her regular trip from Louisville to Cincinnati, and the steamboat United States was descending the Ohio river on her regular trip from Cincinnati to Louisville. Both these boats were owned by the plaintiffs. A collision occurred between them, and the United States immediately afterward took fire, burned to the water's edge, and sank. All the freight on board was lost, as no part of the boat was left but what the fire had in some way or other affected. The upper and lower decks were entirely burned off, the debris with the machinery being thrown into the open hull.

While in this situation the plaintiffs notified the defendants of the loss, and asked their advice as to what course should be pursued. They were answered that the defendants did not recognize any liability on their part for any portion of the loss, and declined to interfere or give advice upon the subject.

The wreck remained where it sank for several weeks, the defendants declining to interfere in the matter, or to give any advice or direction as to what the plaintiffs should do, always alleging that they could not be held liable upon their policy.

Being unable to make any arrangement with the underwriters, the plaintiffs then concluded to raise the broken fragments of the vessel; and after much labor and the expenditure of a large sum of money were enabled to float the hull, which was towed to Cincinnati and placed upon the marine railway, that it might be ascertained whether the boat could be repaired.

This, it was found, would result in the expenditure or more than the vessel would be worth after the reparation had been made, and the old materials were then appraised by competent mechanics, taken by the plaintiffs at their appraised value, and used, so far as they were proper for the purpose, in the construction of what was regarded as a new boat. During the rebuilding the defendants had daily

opportunity to know what the plaintiffs were doing, yet made no objection nor protested in any way against the course they were pursuing.

When the boat was finished, her original size in length, in height, and in the construction of her upper works, her cabin and general finish, were not preserved; but, as it was proved, another boat was produced at an expense of $103,543—the actual value of the wreck first being deducted. It was then claimed upon the evidence in the case, as the boat was valued in the policy at $140,000, the defendants were bound to indemnify the plaintiffs to the extent of one-fourteenth of the value of the vessel, which would have been, without deducting the salvage, $10,000, but that being deducted, the plaintiffs asked to recover $9,031 $\frac{60}{100}$ and costs.

There was no direct evidence of an abandonment, either formal or informal, by the plaintiffs to the defendants.

Before the jury, to whom the cause was submitted, had been charged by the judge, the plaintiffs' counsel asked several special instructions, which were given, but as they are all indicated in the general charge, we need not refer particularly to them.

The counsel for the defendants asked various instructions.

1 and 2. That the loss must have been proved to be the result of fire, that peril alone being insured against.

3. That if the collision produced the fire, the underwriters are excused.

The fourth was an abstract idea only, tracing the distinction between "efficient and predominating causes."

The fifth was but the same proposition in a different form, and so is the sixth, and we may also include the seventh in the same category.

8. The plaintiffs must have proved that they abandoned the boat to the underwriters in proper time, or they could not recover for a total loss, but only for such partial loss as it could be shown the vessel suffered by fire, and in such

case, if the vessel was repaired, the cost of repairing, deducting "one-third new from old," can be charged to the underwriters.

9. This charge was but the expression in greater minuteness of the propositions involved in the previous one.

These charges were all refused as asked, and the refusal of the judge to give them excepted to.

TAFT, J., charged the jury as follows:

This suit is upon a policy of insurance, by which the defendant "caused the plaintiffs to be insured in a sum not exceeding $10,000, against *fire only*, upon the steamboat United States, with permission to navigate the usual Western rivers." By this policy the risk of collision is not covered. It is not strange that it should have been claimed for the defendant that, as this loss originated in the collision, it was not covered by the policy. It has been presented as a defense that the loss was by collision, and that the risk of collision, and of other perils of the river, are excepted by limiting the insurance to "*fire only*," and that as the risk of collision was excluded, a *fire* caused by the collision was also excluded. But I can not adopt this construction. Of all the risks to which a steamboat is exposed, fire is the only one covered by this policy. But there is no provision that the risk of fire caused by other perils of the river should be excluded.

If it had been the intention of the parties to exclude losses by fire caused by perils not covered by the policy, it is to be presumed that they would have expressed it. But it seems to me that such a construction would defeat the general and obvious object of procuring any insurance at all. All fires are caused by something, and on steamboats they are generally caused by something known, in the language of insurance, as perils of the river. If the losses from fire caused by perils of the river, or by other perils enumerated in this marine policy, are to be regarded as excluded, it would be very rare that a loss by fire to a

steamboat on the river would not be excluded by such a construction, and the policy would be of very little value to the insured.

The language of the policy, in my opinion, does not require nor justify such a construction.

The construction which I put upon this policy, therefore, is that it insures the plaintiffs against fire from whatever cause, provided it be not caused by some of the perils which are excepted in the policy, of which collision is not one; so that, if you find that any part of this loss was caused by fire, it is not a defense that the fire was caused by the collision.

But the insurers are not responsible for the loss or damage caused by the collision *only*, and not by fire. The breakage of the bow of the United States by the America running into her, and cutting a hole and letting in the water and sinking her, was all the work of the collision, and not to be in any manner charged to the defendant.

As fire supervened and caused the loss for which this suit is brought, you will have the duty of finding what portion of the loss was caused by the collision directly, and what part was caused by the fire.

For the risk of collision proper, the plaintiffs themselves were responsible. As between them and the defendant, you may regard them, the plaintiffs, as insurers against collision.

This discrimination between the loss caused by the collision not through the agency of fire, and the loss caused by the fire, is not without difficulty; but the evidence is all before you on which to make it.

All the repairs, and all the cost of raising and placing the wreck in Cincinnati, fairly attributable to the collision, aside from the fire, must be carefully distinguished from the cost of repairs, raising, transportation, and care of the wreck, which is to be charged to the account of the fire.

But the question which has been contested as the main point in this case is, whether the amount of this loss is to

be ascertained by the rules applying to what is denominated a total loss, or by the rules applying to a partial loss.

A total loss may be actual or constructive. A constructive total loss is where the loss is not actually total, but is so great as to justify the insured in abandoning the subject of insurance, or what remains of it, to the insurers, and claiming a total loss.

It is usual for insured parties in cases of loss, whether actually or only constructively total, by abandonment, to surrender what remains of the boat to the underwriters.

This is a convenient way of making certain what, in many cases, would otherwise be uncertain. The surrender by abandonment of the wreck or salvage is so convenient and so generally adopted in such cases, that the question of an actual total loss without an abandonment arises comparatively seldom.

In the present case there has been no abandonment or sale of the part saved from the boat, but it has been used in rebuilding a new boat or in repairing the old one, and one question, perhaps I ought to say the question for the jury to determine, is, which of these two things has been done. Has a new boat been built, or an old one repaired?

As there was no abandonment of the property saved, no mere constructive total loss can be claimed. But if there was an actual total loss, the recovery may be as for a total loss, without any abandonment, crediting the defendants with the value of what was saved. It is claimed by the defendant that the plaintiffs have themselves settled the question in favor of a partial, instead of a total loss, by reconstructing upon the old hull a new cabin, new boilers and wheels, and wheel-houses, instead of abandoning the saved part to the insurers.

It is also claimed that the precedents on which the plaintiffs rely to establish the total character of the loss have all been cases in which the wrecked or injured vessel had been sold, and the circumstances having justified a sale, an

Sherlock et al. *v.* The Globe Insurance Co.

abandonment became useless, the sale under such circumstances having converted the salvage into money. It has been held in such cases that the abandonment of the money to the insurers, merely that they might repay it to the insured, would be an idle ceremony. This boat was at or near her home port, and was not sold after the disaster, nor abandoned to the insurers.

The case is peculiar, and must be considered and decided on its own circumstances.

The general object of an abandonment is to simplify the settlement of the loss, by making the agreed value in the policy the measure of damages, deducting the value of the salvage; while, if settled as a partial loss, the particular items of loss must be proven, and in case of repairs, the bills of items, or other proofs of the actual cost of the repairs, must be furnished; and after they are proved, there is a deduction, from the amount, of one-third new for old in cases of repairs. In the present case, the valuation in the policy is $140,000. This was agreed upon by the parties to be her value for the time the policy had to run. This valuation binds both parties. All the policies on the steamer amounted to $105,000, or three-fourths of the whole value, the other fourth being at the risk of the owners. The policy of the defendant was for ten thousand dollars, or one-fourteenth of the valuation. In a total loss with no salvage, the recovery would be one-fourteenth of the valuation, or $10,000.

The plaintiffs claim that they have shown an actual total loss by fire, which is the only peril insured against, and that they are entitled to have the damages ascertained as a total loss, measuring the damages by the valuation in the policy with salvage, stating their loss as follows:

Assuming the entire loss, the valuation in the policy, $140,000:

Deducting from this amount as salvage the value of all that was not destroyed by fire, consisting of the cost of

repairing the damage by collision, for which the plaintiffs themselves were responsible, amounting to $6,000 :

And of the net value of the wreck when brought to Cincinnati, less one-half the cost of raising and bringing it here, viz: $12,000 less $2,971.25, the other half of that cost being attributable to the collision, $9,028.75 :

Making the entire salvage to be credited to the insurers, and deducted from the agreed value, $15,028.75 :

Leaving as the entire loss by fire $124,972, one-fourteenth part of which, it is claimed, is to be paid by the defendant under this policy. The amount of the claim thus estimated as for a total loss under this policy, is $9,028.75, with interest from April 1, 1869, to June 6, 1870—fourteen months and five days—$639.54, making the amount due $9,668.29. This is the plaintiffs' claim.

This statement illustrates the method of ascertaining what is denominated a total loss. The figures themselves, as well as the facts on which they are founded, are not given here as facts, but by way of illustration of the mode of calculating the loss as a total loss. If you should find a total loss, you will find the facts and figures for yourselves on the evidence. You will observe that in ascertaining this amount, the agreed value in the policy forms the basis of calculation. It is to avoid difficulty in ascertaining the actual value in the event of a total loss that the valuation is made when the policy is issued; and, unless fraudulent, which is not claimed in this case, it is binding on both parties.

The counsel for the defendant, on the other hand, claim that the loss is not actually total, and that as there has been no abandonment to the insurers of what remained after the disaster, it is to be ascertained as a partial loss.

By regarding the plaintiffs as having repaired
   the steamer United States at a cost, as shown
   by the statements of witnesses, and the bills
   and books, of...........................................$103,543 97

| | | |
|---|---:|---:|
| Subject, however, to deductions of $7,080 for expense of repairs attributable to the collision as well as of other items, which I need not enumerate, but which all together amount to ...................................................................... | $10,191 | 29 |

| | | |
|---|---:|---:|
| Leaving as net cost of repairs caused by the fire | $93,352 | 68 |
| Deducting one-third as the difference between new and old materials................................ | 31,114 | 23 |

| | | |
|---|---:|---:|
| Making the entire loss............................ | $62,238 | 45 |
| One-fourteenth of this to be borne by the defendants, which, with interest, is said to amount to ............................................. | $4,694 | 60 |

Thus, in the peculiar circumstances of this case, the entire loss is $124,972 or $62,238.45, and the defendant's share of it is $9,668.29 or $4,694.60, as you calculate it by the rules of a total, or of a partial loss, or nearly in those proportions.

And the difference in the amount of loss upon the single risk of the defendant, made by these different modes of casting it, is $4,950.22, or one is about double that of the other. Both are intended to effect the same object, viz: the indemnity of the insured.

I do not vouch for the accuracy of these figures, although they are probably not far from correct. But the responsibility of making the calculations for yourselves I leave with you, where it belongs.

But these statements illustrate the two modes of ascertaining the amount of a loss, and show you the precise nature of the controversy, as well as the importance of the question you have to decide.

It is claimed by the counsel for the plaintiffs that the United States received a comparatively small damage by collision, which could have been easily repaired for a small sum compared with her value, and that the collision was

immediately followed by fire, which totally destroyed the boat for the purposes and uses of a steamboat, so that the United States steamer no longer existed as a steamer, and to repair the damage done by fire to the boat would require a cost greater than the value of the steamer when wholly repaired, or rebuilt in the form and style in which she existed before the accident.

The defendant's counsel, on the other hand, claim that the United States was not wholly destroyed in the sense claimed by the plaintiffs, nor in any sense; that she could have been repaired, and was repaired by the plaintiffs themselves in the form and manner which they preferred, and that the cost of said repairs, so far as attributable to the loss by fire, did not exceed $93,352.68, from which, by the terms of the policy, they are entitled to have one-third deducted as the agreed difference between the new and old materials. If the steamboat was a proper subject of repair, retaining her identity as a steamboat, and in such a condition that a prudent uninsured owner would have repaired her, the rule of recovery would be as for a partial loss.

The rule by which to determine in what cases the indemnity is to be ascertained on the principle of a total loss, and in what cases it is to be ascertained on the principle of a partial loss, has been the subject of earnest discussion in many cases, and of various, if not contradictory, opinions, both in America and in England, from which country we derive many of the doctrines of insurance law. It has also been very much and ably discussed in this case.

I have said that cases of actual total loss, without abandonment, arise comparatively seldom. Nevertheless, in the vast number and variety of insurance cases which have arisen and been recorded in the reports of English and American judicial proceedings, there have been several cases of what is denominated actual as distinguished from constructive total losses, without any notice of aban-

donment, where the ship or the wreck has been sold by the captain, under various circumstances.

Several cases have arisen in which a ship, on a foreign coast or in a foreign port, has been reduced by perils insured against to a condition from which she could not be recovered and repaired without incurring an expense greater than her repaired value, in which condition a prudent uninsured owner would not attempt to repair, and the captain has, as the best course for all concerned, sold her for a small value, and the owners have sued for a total loss, without giving notice of an abandonment. In this class of cases the inquiry has generally been, whether the ship, under the circumstances of each case, was capable of repair at all, or if she could be repaired, whether the cost would exceed her repaired value; and if so, her repairs have been held to be impracticable and the sale justified, and the recovery has been permitted for an actual total loss, without any notice of abandonment, crediting the insurers with the proceeds of the sale.

These cases have generally, if not universally, arisen upon losses which have happened away from the home port, and where the cost of repair has been enhanced by the absence of facilities for making repairs, or for recovering a ship from her perils; in those cases, however, the question has been considered one of actual total loss, and the insured has been charged with the proceeds of the sale of the wreck.

No case has been cited from the books where a steamboat has suffered a disaster at or near her home port, and remained in form a steamboat, and where the wreck has not been sold nor abandoned to the underwriters, and the insured have recovered as for total loss on the ground that to repair her would cost more than her repaired value. But the cases to which I have referred have generally, if not in every instance, gone upon the idea that a total loss must exist to justify the sale.

The circumstances of this case are peculiar. The ques-

tion whether the cost of repairs would exceed the repaired value could not ordinarily arise in a home port, where repairs could be most advantageously made, and where what was saved would be safe. The circumstances, as claimed to exist in the present case, are peculiar in this, that by the change in the trade to which she was destined the original form and style of the " United States " had become exceptional, and to restore it by repair or reconstruction, it is claimed, would cost more than she would be worth when so repaired or reconstructed.

Now, it is not necessary that I should detail the difficulties I have found in analyzing and comparing the authorities on this subject, or in the application of the principles of the decided cases to the evidence in the present case. I may, however, in general, remark that, while I find no decided case precisely like the present, in which the fact that the cost of repair would exceed the repaired value has been held to entitle the insured to recover for a total loss without abandonment, it does appear to me that the principles of the decisions to which I have referred logically applied to the facts of this case, as the plaintiffs claim them to be, would make it a case of actual total loss. That is to say, if the jury should find that this steamboat did remain *in specie*, but was so badly damaged *by fire* that to repair that damage would cost more than she would be worth when fully repaired both as to the damage by fire and collision, the repairs of the damage by fire must be considered as impracticable, and the loss actually total, without abandonment.

The loss by collision is to be regarded between the plaintiffs and defendants as so much saved, so that the amount of the cost of repairing the damage done by fire, after the damage by collision has been repaired by the plaintiffs, must exceed the value of the entire boat when repaired; and if that fact is found by the jury, they will ascertain the damage on the principle of a total loss, crediting the defendants with the cost of repairs attribu-

table to the collision and with the net value of the wreck.

The total loss of a steamboat, contemplated as a subject of insurance, does not mean the annihilation of the timbers and iron of which it is composed; nor does it necessarily mean the destruction of their value as materials for building another boat, or for other purposes. But it does mean the entire destruction of the steamboat as a steamboat, for the uses and purposes of the steamboat insured. This may happen by sinking her in the sea beyond hope of recovery; by reducing her to ashes; by reducing her to a condition in which she can not be repaired at all, or in which the cost of repair would exceed her value when repaired, so that a prudent uninsured owner would not attempt to repair, as it would only increase the loss; in either of which conditions, if caused by a risk insured against, as in the present case, by fire, it is to be regarded as an actual total loss of the steamer, within the meaning of the policy.

And if you should find from the evidence in this case, that the steamboat United States insured by this policy was thus totally destroyed by fire, for the purposes and uses of the insured steamboat, you will proceed to ascertain the amount of the loss on the principle of a total loss.

But if you find that the steamboat was not an actual total loss by fire, in the sense I have explained—that she survived the fire, and could have been repaired of all damage by fire at a cost not exceeding her value when fully repaired—you will proceed to ascertain the damage by fire on the principle of a partial loss.

Intimately connected with this question, and preliminary to it, is another also peculiar to this case: What is to be comprehended under the term repairs of the steamer United States? The plaintiffs claim that it is the restoration of the United States, with her two cabins and furniture in all respects as she was before the accident; and

that the cost of replacing both cabins is to be included in the estimate of the cost of repairs in determining whether her repairs would cost more than she would be worth when repaired.

The counsel for the defendants, on the other hand, say that she has been repaired by the plaintiffs in the way they preferred, and is worth as much as she would have been with both cabins replaced, and that the cost of this repair, reduced by deducting that part which is attributable to the collision, furnishes the criterion by which you are to decide whether the cost of repairs caused by the fire, exceeds the repaired value.

To illustrate this difference by figures: If to restore the United States to her old form, with both cabins, would cost, in addition to the repairs due to the collision, $130,000, or any sum less than the $130,000, that would make a case of total loss, on the plaintiffs' hypothesis, that the repair of the United States must be taken to be restoring her to her former condition. On the other hand, if the steamer has been repaired, as the defendants' counsel claim, at a cost for damage due to the fire of about $93,000, and the repaired boat was worth, when repaired, $100,000, or any sum above the cost of repairs due to the fire, it would be a case of partial loss, on the hypothesis of the defendant's counsel, that the plaintiffs have actually repaired the insured steamer.

This is a question of fact for you to determine from the evidence. Whether what has been done under all the circumstances constitutes a repair of the steamer United States, or the building of another and different boat, is a question for you to determine. You have heard all the testimony. I have allowed or intended to allow all the evidence tending to sustain both theories to be presented to you, that you might have before you the means of forming a fair and just opinion.

The counsel for each party have insisted that the court should decide this question, by excluding evidence off red

to support the theory of the other party as to what constituted repairs to the steamer United States. But it has seemed to me that it is a practical question of fact which the Court can not safely undertake to decide. I have concluded, therefore, to leave it to you, upon all the evidence, and under all the circumstances, what was a fair estimate of the repairs of the steamer United States, made necessary by the fire, excluding the cost of those which were attributable to the collision, if she could be repaired; and whether such repairs would have cost, or did cost, more than the value of the boat when fully repaired.

You will find it convenient to settle this last question first, as preliminary to the great question, whether the case is one of a total, or a partial loss.

To portions of this charge the defendants excepted; and afterward presented other and further instructions to the Court, which were given.

A verdict was rendered for the plaintiffs for $9,558.62, and the defendants moved for a new trial alleging the verdict was against the law of the case and the evidence also.

The questions involved in this motion were reserved for opinion of the court in General Term.

*Stanley Matthews, George Hoadly,* and *Lincoln, Smith, Warnock & Stephens,* for plaintiffs.

*Wm. Y. Gholson, George E. Pugh, George H. Pendleton,* and *Burnett, Follett & Wright,* contra.

STORER, J. A careful examination of the pleadings, and the evidence contained in six hundred pages of the bill of exceptions, presents these questions for our decision:

*First.* Was the loss of the vessel caused by the peril against which she was insured?

*Second.* Was the loss a total one absolutely or constructively total only?

*Third.* Was the vessel rebuilt, resulting in a new and different structure, or was she simply repaired, subjecting her to the deduction of one-third new for old, in the adjustment of the loss?

*Fourth.* Was the policy forfeited by a disobedience of any laws of the United States, forbidding certain species of merchandise from being carried on the vessel without a license?

There is no denial in the answer that the loss was the consequence of fire, although it is alleged the flames which consumed the vessel were produced by the contact of the America with some packages of aqua fortis on board the United States, which the plaintiffs were prohibited from transporting on their vessel by the act of Congress of August 30, 1832. 10 Statutes at Large, sec. 46, p. 63.

It is immaterial how the fire was produced, whether by mere accident or the negligence even of the officers of the vessel, if there has been no fraudulent or barratrous conduct on their part to which the loss may fairly be attributed. This rule we regard as authoritatively settled, and another rule also, that in all cases of loss within the perils insured against, the proximate, not the remote cause of the injury, is to be regarded in determining the liability of the underwriter. 2 Arnauld on Ins., 3d ed. 670; *Busk* v. *Royal Exchange Co.*, 2 B. & Ald. 73; *Walker* v. *Maitland*, 5 Ib. 171. These cases have established the law in England, and have been approved by numerous subsequent decisions.

This also is the law as we find it recognized by our own courts. *Columbia Ins. Co.* v. *Lawrence*, 10 Pet. 517; *Waters* v. *Merchants' Ins. Co.*, 11 Pet. 215; *Perrin* v. *Protection Ins. Co.*, 11 Ohio, 147. See also 2 Phillips on Ins. 1032.

If we apply these principles to the evidence we find in the record, we are satisfied the loss of the vessel was caused by the direct peril against which the plaintiffs were insured, and no fraud can be imputed to the plaintiffs in producing it.

The jury might well have found as they did, and we think upon this point their verdict ought not to be disturbed.

*Second.* Was the loss a total one, or merely constructively total, which requires, on the part of the insurers, a formal abandonment to the underwriters?

When the vessel founders at sea, or is so broken up by being wrecked that it is obvious the subject insured ceases to be of any value as a vessel, although some of the planks may remain, we may regard the liability of the insurers is fixed, though there be no abandonment. The circumstances of each case must therefore determine the extent of the loss. This doctrine is very clearly stated and explained by Lord Abinger, in *Rowe* v. *Salvador*, 3 Bingham N. C. 266, in the Exchequer Chamber, in a most exhaustive examination of the question. See also the case of *Cambridge* v. *Anderton*, first reported in Ryan & Moody, 61, at Nisi Prius, afterward in the King's Bench, 3 Bingham N. C. 203, and 2 B. & C. 691; see also *Gardner* v. *Salvador*, 1 Moody & R. 116.

An abandonment is but the formal cession of what may become salvage, when the vessel that has suffered from the peril against which the owners have been insured is yet susceptible of repair, and only confers the same right the insurers would have had by subrogation on payment of the sum insured. Meanwhile the master of the vessel, up to the time of the abandonment, is the agent both of the insured and the insurer; if the offer to abandon is accepted or refused, he is the agent of the underwriter only.

We understand a constructive total loss, as the law now exists, both in England and the United States, takes place, to use the language of 2 Arnauld, 850, " where the subject insured is not destroyed, but its destruction is made highly probable, and its recovery, though not utterly hopeless, is either exceedingly doubtful or too expensive to warrant the attempt; or where the vessel could not be made navigable, except at a cost greater than her repaired value."

2 Arnauld, 955. The application of the rule thus stated is extended in the United States to those cases where the cost of repairs will exceed half the value of the vessel. *Peele* v. *Merchant Ins. Co.,* Cr. 3, Mason, 27; *Bradlie* v. *Maryland Ins. Co.,* 12 Peters, 278.

It seems to be admitted by all the writers upon marine insurance, that in every case of a constructive total loss, there must be, as a general rule, evidence of an abandonment by the owners to the insurers.

But if the claim of the defendants should have been sustained as to the extent of the loss, it is settled in every such case that circumstances may exist which will excuse what might otherwise have been the duty of the insured to prove. Now; in the case before us, while there is a denial in the answer of any loss under the policy, there is no allegation of the constructive loss, or of a neglect to abandon, or even of any loss total or partial; but we have no doubt under the averment of a total loss it may be proved to have been a constructive total loss only, and we notice this fact merely to warrant the belief that the insurers did not intend to admit their liability in any event.

The contract of insurance is said to require the utmost good faith of all the parties interested. "*Uberrima fides*" is the maxim which the writers on this branch of the law have applied to the insured as well as to the underwriter. The acts of either may estop them, if inconsistent with fair dealing, and this is the same rule we always recognize where one party to a contract has so demeaned himself toward the other that he has been led to believe certain facts have thereby existed, and has acted on this presumption, there may well be an estoppel "*in pais.*"

It is on this principle the law will never require a vain thing to be done, if it can be fairly inferred the performance of an agreement has been waived.

Hence it is preliminary proof of loss is always required to be given in every suit upon a policy of insurance unless it is waived. This may be by an absolute refusal to pay the

loss, or the silence of the insurers and other acts from which it may be implied the proof would not be demanded. 2 Phillips, §§ 1812, 1813, where the cases are collected. And we see no reason why we may not extend the principle to the waiver of an abandonment; the one is equally the right of the underwriters to require as the other. Mr. Arnauld, vol. 2, p. 888, admits the rule where he says : "And so *e converso*, in a case where the insured would be entitled otherwise to notice of abandonment, the underwriters by their own conduct may forfeit their right to insist upon it." See also the opinions of Buller and Ashurst, JJ., in *Da Costa* v. *Newham*, 2 T. R. 407.

If, then, notice of an abandonment was necessary, the conduct of the underwriters, when applied to for an adjustment of the loss, was such as to waive the right to require it. The claim when made to the defendants was for a total loss, and it was held by Judge Johnston, in *Patapsco Ins. Co.* v. *Southgate*, 5 Pet. 604, that such a claim was equivalent to an abandonment, and the case of *Cassidy* v. *La. State Ins. Co.*, 18 Martin, 421, is to the same effect. 2 Parsons on Ins. 172–176 ; *Twyng* v. *Washington Ins. Co.*, 10 Gray, 443 ; *Portsmouth Ins. Co.* v. *Brazee*, 17 Ohio, 81.

The instructions asked of the judge as to the application of the rule one-third new for old were properly refused, but in his general charge he stated the law very fully as we understand it.

No underwriter can claim the deduction where no repairs as such have been made, and where the salvage is appropriated to build a new vessel, the idea of repair can not be entertained, else an anchor or boat or some portion only of the wreck may be saved, and if used on a new vessel, it might, with the same justice, demand the rigid application of the doctrine in the adjustment of a loss. If the defendants have received the full value of the salvage, in a credit of the amount in the policy, they have obtained all the benefit they could derive, if they had undertaken to raise the vessel themselves, as it is evident they would

not have succeeded better than the plaintiffs in reconstructing her, as they must necessarily have expended a hundred thousand dollars in the operation.

Another ground of defense set up in the answer was the alleged unseaworthiness of the United States, by the non-compliance of the owners with sections 45 and 46 of the law of Congress, 10 Statutes at Large, 63. These sections prohibited the transportation of "gunpowder, oil of turpentine, camphene, and other burning fluids," except secured in metallic vessels, and except in cases of special license, and affix the penalty of one hundred dollars for the neglect to obtain the license, as well as for receiving the property on board the vessel as freight.

It is in evidence that the plaintiffs did obtain, as early as the 22d February, 1868, from the local inspectors whose duty it was to grant the same, a license to carry on board the United States oil of vitriol in the manner prescribed by the law.

But we do not apprehend that a non-compliance with this statute, where no forfeiture is imposed of the vessel or the forbidden merchandise, can *per se* make the vessel unseaworthy.

This question has often been mooted before the courts, and the decision always has been, that the omission of the carrier to perform the duties prescribed by similar statutes does not affect the insurance on the vessel or cargo. *Deshon* v. *Merchants' Ins. Co.,* 11 Met. 209; *Warren* v. *Manuf. Ins. Co.,* 13 Pick. 521; *Clark et al.* v. *Protection Ins. Co.,* 1 Story, 124.

Counsel have agreed that if they have proved the loss was caused by the neglect or unskillfulness of the officers of the America, they have the right to be subrogated to any claim against the owners of that boat; but how it is that this proposition can be predicated upon anything we find in the record we can not readily perceive. There is no evidence, in our opinion, which can authorize it, and there is none to raise the implication of any dereliction of duty on the part of the officers of the America. It is

mere hypothesis only, and if there was any ground to make the assertion, it could only be permitted to the insurer to demand a subrogation after he has, in good faith, paid the insured for the loss of his vessel: such payment *ex vi termini* being a virtual assignment of all the rights of the assured against third persons growing out of the loss.

The consideration of the questions that have been made in argument has demanded more of our time than is usually allotted to the examination of causes submitted for our decision, not so much for the novelty and difficulty this litigation presents, but rather for the many points urged by the able counsel engaged, the decision of which has required us to review the whole record, and glean from its many pages whatever was pertinent to the issue. Our labors would have been greatly lessened had there been less cumulative testimony, tending, as it always does, to obscure rather than enlighten.

But we have, nevertheless, without dissent, arrived at a conclusion satisfactory to ourselves upon every point made in the cause. We believe the loss of the vessel under the circumstances may have been regarded as absolutely total, though it may have been in reality but constructively total; that what was equivalent to a waiver of abandonment was proved; that the conduct of the defendants made it unnecessary, as it would have been useless, to offer what they had already practically refused to accept, even if made in a formal manner; that the plaintiffs, in raising the wreck and towing it from the place of the accident to Cincinnati, were justified by the facts proved; that there was no repair of the former structure, but the building of a new boat, and no claim of one-third new for old can be set up by the defendants, as by the verdict the entire amount of salvage was allowed to the underwriters in settling the loss.

And we fully coincide with the opinion of our colleague who tried the case, as he has lucidly stated it in his charge,

and upon which the jury, after determining the facts before them, rendered their verdict.

We are all of the opinion the motion for a new trial must be overruled and judgment entered on the verdict.